```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF NEW JERSEY
```
─────────────────────────────────

KAZAR MILTON,

    Plaintiff,

v.

CITY OF CAMDEN, COUNTY OF
CAMDEN, STATE OF NEW JERSEY,
CAMDEN COUNTY PROSECUTOR'S
OFFICE, IRA SLOVIN, CHIEF
GREGORY SMITH, INVESTIGATOR
JAMES BRUNO, STEVEN SETTLES,
and OFFICER WILLIAM BENJAMIN,

    Defendants.

No. 1:15-cv-1527 (NLH/KMW)

**OPINION**

─────────────────────────────────

**APPEARANCES:**

DANIEL J. MCCRACKEN
LAW OFFICES OF CONRAD J. BENEDETTO
1405 CHEWS LANDING ROAD SUITE 21
LAUREL SPRINGS, NJ 08021
    On behalf of Plaintiff

SURINDER K. AGGARWAL
86 COURT STREET
FREEHOLD, NJ 07728
    On behalf of Plaintiff

THOMAS GERARD MASCIOCCHI
KEAVENEY LEGAL GROUP, LLC.
1101 N. KINGS HIGHWAY
SUITE G100
CHERRY HILL, NJ 08034
    On behalf of Plaintiff

ROBERT J. MCGUIRE
NEW JERSEY ATTORNEY GENERAL
25 MARKET STREET

P.O. BOX 116
TRENTON, NJ 08625
    On behalf of Defendant James Bruno

**HILLMAN**, District Judge

This matter concerns the alleged malicious prosecution of Plaintiff Kazar Milton by Defendant Investigator James Bruno. Plaintiff was charged with the murder of Luis Rolon. Before the Court is Defendant's Motion for Summary Judgment. For the reasons that follow, the Court will grant Defendant's motion.

**I.**

The Court takes its facts from Defendant's Statement of Material Facts Not in Dispute, Plaintiff's Response, Plaintiff's Statement of Material Facts Not in Dispute, and Defendant's Response. Where the Court takes its facts from a different source, the Court so indicates.

Luis Rolon was murdered at his residence on January 16, 2008. His girlfriend, Crystal Ford, witnessed the murder. Defendant, a Senior Investigator to the Camden County Prosecutor's Office Homicide Unit, was the lead investigator assigned to the Rolon case. As a Senior Investigator, his job responsibilities included conducting an investigation, interviewing witnesses, obtaining taped statements, and responding to and assessing crime scenes.

Ford provided Defendant with an initial statement during the early morning hours of January 17, 2008, in which she

2

described the murder. According to Ford, Rolon answered the door for someone he appeared to know, and the first person to enter "strong armed" his way in and "started tussling" with Rolon. Ford said the first person to enter asked "Where the shit at?" before shooting Rolon, after which two more men entered the residence.[1] They searched the house and Rolon's pockets before leaving. Ford called the Camden Police Department at 10:34 PM to report the shooting.

Ford indicated that the person who shot Rolon was a black male between 5'9 and 6'0 and had a mustache and a beard. He was not wearing a mask. She said the shooter wore a black skully hat, black coat, blue and white striped shirt, and blue jeans. The shooter shot Rolon with his left hand.[2] Ford told investigators that the shooter was about five feet away from her when Rolon was shot and that "[i]f [she saw] him again [she] could tell [investigators] that's him."

As to the other two individuals who entered, Ford said one

---

[1] Ford informed the police that Rolon had recently stopped selling marijuana and that he had sold cocaine in the past.

[2] Defendant testified he did not consider the fact that the gun was fired with the left hand of major significance, since the shooter was engaged in a "tussle" and "fighting close" at the time of the shooting. Defendant testified that it is easy to shoot with either hand when firing at close range, and that certain people shoot with one hand while they write with the other hand. Defendant never noted whether Plaintiff was left-handed or right-handed.

3

wore a black mask over his face from his eyes down and wore a grey hoodie. Ford at first said this person was wearing grey pants, but then said several times that the pants were tan. While Ford was unable to provide a description of the third person, she indicated he may have been wearing a black coat. (Pl. Ex. D at 12).

Later in the morning on January 17, 2008, Defendant and Detective Cheryl Campbell of the Camden Police Department arrived at Ford's home. Ford accompanied them to the Prosecutor's Office. There, Investigator John Greer of the Camden County Prosecutor's Office Homicide Unit showed her a photo array that included Plaintiff's picture. Ford thereafter gave a videotaped statement identifying Plaintiff from the photo array as the person who shot Rolon. Ford stated she had known Plaintiff for about ten years, because she used to live across the street from Plaintiff's girlfriend.

Ford testified at her deposition that she identified Plaintiff because she "felt pressured" by an individual who was not the Defendant. More specifically, she said the person who made her feel pressured was an "older white man" with white hair and a moustache, a person she recognized to be different from the person who interviewed her in the early morning hours of January 17th; in other words, someone other than Defendant, who had conducted that interview. At the time, Ford and the older

4

unidentified man were the only people in the room. Other circumstances regarding Ford's identification of Plaintiff are also in dispute. Plaintiff recanted her identification in 2011.

On the night of Rolon's murder, Defendant learned that local police had issued a request to stop a suspicious black pickup truck seen in the area. The vehicle was located and stopped by police. The occupants of the vehicle were Raheem Brittingham and Donte Simmons. One of the occupants was wearing tan pants. Defendant and other officers met with Brittingham and Simmons and interviewed them. Defendant stated there was "[n]o doubt in [his] mind those were the guys in the house." (Pl. Ex. B at 27:13-18).

Defendant asked about their whereabouts prior to the police stop, and Defendant testified he disbelieved their responses because they gave conflicting stories. Brittingham and Simmons thereafter both verbally consented to provide their clothing to the police to be tested for evidence. One of the individuals was detained because he had an outstanding warrant, but the police could not otherwise hold them. (Pl. Ex. B at 27:18-20). Defendant did not obtain a recorded statement from either Brittingham or Simmons. Final testing on the tan pants collected from Brittingham did not reveal the presence of blood. However, no trace evidence analysis was performed.

Camden City Police Officer William Benjamin was Simmons's

5

step-father. He was present at the scene when the police stopped Brittingham and Simmons. Defendant claims Benjamin recognized the vehicle and described its "frequent operator" as a black stocky male in his thirties with a beard and mustache. Benjamin spoke with Simmons and advised Defendant that the individual who regularly operated the truck was known as "Smack." Defendant then learned from Richard Norcross of the Camden County Prosecutor's Office Intelligence Unit that the Prosecutor's Office had intelligence indicating Plaintiff supposedly used the nicknames "Smack" and "Fats."

On January 28, 2008, Defendant requested a search warrant for the vehicle in which Brittingham and Simmons had been riding the night of Rolon's murder. During the execution of the search warrant, the entire vehicle was processed and certain items were collected as evidence and tested for fingerprints. There was no match between the fingerprint lifts taken from the vehicle or the items and Plaintiff's fingerprints. During the search, several articles of clothing were found that were consistent with a description of the clothing worn by the perpetrators of the Rolon murder. These articles were photographed but not removed. Pursuant to another search warrant, these items were later collected.

On January 18, 2008, Defendant consulted with Gregory Smith, the Section Chief for the Homicide Unit, about this case.

Following the consultation, Defendant prepared the complaint charging Plaintiff with Rolon's murder. Plaintiff was arrested that day. That afternoon, Defendant interviewed Plaintiff. Plaintiff admitted knowing Rolon and said he frequently purchased marijuana from him. Plaintiff denied involvement in the murder.

As to his whereabouts on the night of Rolon's murder, Plaintiff told Defendant that around 10:20 PM he arrived at Kevin Black, Jr.'s home, picked him up, and started driving around the area. They then returned to Black's home and talked for several minutes. Then a person by the nickname of "6-9" asked for a ride to the Walter Rand Transportation Center in Camden, New Jersey. Plaintiff said he arrived at the Walter Rand Transportation Center in his girlfriend's cream-colored Chevy Impala at 10:33 PM – the departure time for the bus 6-9 wanted to ride. Defendant determined the travel time between the murder scene and the Walter Rand Transportation Center was approximately fifteen minutes.

Around 10:40 to 10:42, Plaintiff arrived at the AM-PM Market. He then received a phone call from Black informing him Rolon had been killed. Plaintiff said he then went to Black's house. After giving this account, Plaintiff added that, before Black called him, Black's father, Kevin Black, Sr. had called him asking if he knew where his son was. After the call from

7

Black, Jr., Plaintiff stood in front of the Black residence speaking with Black, Sr. and then went home.[3]

Defendant later learned that 6-9 was William Whitfield, who confirmed in an interview that Plaintiff had given him a ride to the Walter Rand Transportation Center on the night of Rolon's shooting. Defendant also obtained video footage from the Walter Rand Transportation Center, which showed a light-colored vehicle resembling a Chevy Impala dropping someone off at the curb to the Transportation Center at 10:34 PM, although it was impossible from the video footage to determine who was driving the vehicle.[4]

Defendant spoke with Jamal Gibbs, who stated he knew Plaintiff and had sold drugs for him in the past. Gibbs also stated that Black, Jr. told him Plaintiff had committed a home invasion at Rolon's home looking for a safe and that Plaintiff had shot Rolon when the location of the safe was not revealed.

Defendant also spoke with Dashand Chase, who stated that Plaintiff told him he shot Rolon in front of Rolon's "baby mom" and baby. Chase said that Plaintiff expected to "beat the case" because Rolon's "baby mom," presumably Ford, had been paid

---

[3] When Defendant interviewed Black, Sr. a few days later, he denied speaking with Plaintiff by phone or in person the night of Rolon's murder.

[4] This is the same time Ford contacted the Camden Police Department to report the shooting.

8

$25,000 to "change her story."  Defendant also spoke with Raymond Berrios, who stated he had seen a person known as FA, confirmed as being Plaintiff, enter Rolon's house on the night of his murder, and that he then saw a flash inside and Plaintiff exit the house and enter a parked vehicle.

Ford stated that Rolon used to sell cocaine with an individual named David Clark and that Clark believed Rolon owed him money.  While Ford identified Clark as a person with whom Rolon had a dispute, Defendant did not attempt to locate or speak with Clark.

The Prosecutor's Office presented the evidence supporting a murder charge against Plaintiff to a grand jury on January 28, 2009, in which Defendant testified.  Defendant related what Ford had told him about the night of the shooting and about how Brittingham and Simmons were stopped that night, but that Ford did not identify them as people she recognized as being involved in the murder.  Defendant informed the grand jury that Plaintiff denied involvement and of Plaintiff's account of his whereabouts on the night of Rolon's murder.  He also informed the grand jury that he confirmed a bus was leaving the Walter Rand Transportation Center that night and what he had seen in the video footage.  Defendant also informed the grand jury that Whitfield had told Defendant that Plaintiff dropped him off at the Walter Rand Transportation Center the night of Rolon's

murder.  Defendant also related Gibbs' statement and Berrios' statement.  Plaintiff was thereafter indicted.

Plaintiff was separately charged and indicted for making terroristic threats in another incident, and Plaintiff agreed to plead guilty to the charge of having made terroristic threats, for which Plaintiff received a three-year sentence.  Although the circumstances are in dispute, the murder charge was dismissed.

Plaintiff filed his Complaint before this Court on February 27, 2015 against multiple defendants, including Defendant Bruno.  After the Court's February 19, 2016 Order on a Motion to Dismiss, Plaintiff filed an Amended Complaint asserting claims against Defendant Bruno only.  Defendant filed a May 16, 2016 Motion to Dismiss, which was denied on December 9, 2016.  Defendant filed his Motion for Summary Judgment on December 7, 2017.

## II.

This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

## III.

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits if any,' . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (citing Anderson, 477 U.S. at 255).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."); see Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing" – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." (citing Celotex, 477 U.S. at 325)).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324. A "party opposing summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading[s].'" Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). For "the non-moving party[] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Cooper v. Sniezek, 418 F. App'x 56, 58 (3d Cir. 2011) (citing Celotex, 477 U.S. at 322). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by

the moving party.  Anderson, 477 U.S. at 257.

**IV.**

**A. Sovereign Immunity**

The Court begins with Defendant's argument that he is entitled to sovereign immunity under the Eleventh Amendment. The Eleventh Amendment to the U.S. Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.  "Under the Eleventh Amendment, each State is a sovereign entity that is not amenable to lawsuits brought in federal court without its consent." Palmerini v. Burgos, No. 10-210, 2011 U.S. Dist. LEXIS 90539, at *20 (D.N.J. Aug. 15, 2011).  "Eleventh Amendment immunity applies to agencies, departments, and officials of the State 'even though the state is not named as a party to the action as long as the state is the real party in interest.'"  Frost v. County of Monmouth, No. 17-4395, 2018 U.S. Dist. LEXIS 49276, at *19 (D.N.J. Mar. 26, 2018).

However, Plaintiff's Amended Complaint specifically states that Defendant "is sued in his individual capacity."  (Compl. ¶ 3).  "The Eleventh Amendment does not preclude suits brought against state officials in their individual capacities . . . ."

Johnson v. Stith, No. 14-5032, 2015 U.S. Dist. LEXIS 109914, at *9 (D.N.J. Aug. 20, 2015); accord Slinger v. New Jersey, 366 F. App'x 357, 361 (3d Cir. 2010) ("[T]he Eleventh Amendment does not bar suits brought against state officials in their individual capacities, even if the actions which are the subject of the suit were part of their official duties . . . ."); Garden State Elec. Inspection Servs., Inc. v. Levin, 144 F. App'x 247, 251 (3d Cir. 2005) ("The Eleventh Amendment does not . . . bar suits for damages against government officials sued in their personal capacities. In personal capacity suits, a plaintiff seeks to impose personal liability upon an individual officer and recover from the personal assets of that officer. Therefore, the Eleventh Amendment is not implicated because the State is not the real party in interest."); Tassel v. Ocean County, No. 16-4761, 2017 U.S. Dist. LEXIS 190953, at *14 (D.N.J. Nov. 17, 2017) ("Because the Eleventh Amendment only bars suits against state officials in their official capacities, Plaintiffs are entitled to proceed against Defendants in their individual capacities."); Zahner v. Lamper, No. 16-2635, 2017 U.S. Dist. LEXIS 168720, at *10 (E.D. Pa. Oct. 12, 2017) ("[T]here are numerous Section 1983 cases holding that a government official named in her individual capacity does not receive any sovereign immunity protection."); Wilson v. N.J. Div. of Child Prot. & Permanency, No. 13-3346, 2016 U.S. Dist.

14

LEXIS 8869, at *15 (D.N.J. Jan. 25, 2016) ("A state official in his or her individual capacity does not partake of the state's Eleventh Amendment sovereign immunity . . . ."); Grohs v. Yatauro, 984 F. Supp. 2d 273, 281 (D.N.J. Nov. 20, 2013) ("In that individual capacity, he or she does not partake of the state's Eleventh Amendment sovereign immunity . . . ."). Accordingly, the Court will not dismiss Plaintiff's Amended Complaint on sovereign immunity grounds.

### B. The Merits of Plaintiff's Malicious Prosecution Claims

> To prevail on a malicious prosecution claim under section 1983, a plaintiff must show that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

McKenna v. City of Philadelphia, 582 F.3d 447, 461 (3d Cir. 2009). The elements are the same under the New Jersey Civil Rights Act. See Ianuale v. Keyport Township, No. 15-8256, 2016 U.S. Dist. LEXIS 141703, at *32 (D.N.J. Oct. 13, 2016); Johnson v. Stith, No. 14-5032, 2015 U.S. Dist. LEXIS 109914, at *13-14 (D.N.J. Aug. 20, 2015); Vazquez v. City of Atlantic City, No. 12-1752, 2014 U.S. Dist. LEXIS 87662, at *26 (D.N.J. June 27, 2014).

As the bulk of the parties' briefing is dedicated to

whether the proceeding was initiated without probable cause, the Court begins there. "Probable cause means 'facts and circumstances. . . that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense.'" Camiolo v. State Farm Fire & Cas. Co., 334 F.3d 345, 363 (3d Cir. 2003). "[I]n a section 1983 malicious prosecution action, as in a common law action for malicious prosecution, a grand jury indictment or presentment constitutes prima facie evidence of probable cause to prosecute . . . ." Rose v. Bartle, 871 F.2d 331, 353 (3d Cir. 1989). However, "this prima facie evidence may be rebutted by evidence that the presentment was procured by fraud, perjury or other corrupt means." Id.; accord Camiolo, 334 F.3d at 363.

Plaintiff's argument almost exclusively focuses on purported failures of Defendant to investigate certain aspects of the Rolon murder. Namely, Plaintiff argues the following:

- Defendant "never took note of whether Plaintiff was right-handed or left-handed," despite Ford identifying the shooter as left-handed. (Pl. Br. 6).

- Defendant "made no attempt to locate or speak with" Clark, despite Ford identifying him as a person with whom Rolon had a dispute. (Pl. Br. 6).

- Defendant "failed to obtain a recorded statement" from Brittingham and Simmons, despite stating he had "no doubt that they were involved in the murder." (Pl. Br. 7).

16

- Defendant "did not believe it prudent for Benjamin to provide him with a formal statement." (Pl. Br. 9).

- Defendant "ma[de] no mention of any attempt to locate or identify" a third individual who was observed talking to the individuals in the Chevrolet pick-up. (Pl. Br. 9).

- Defendant "made no attempt to ascertain whether the AM/PM Mart possessed any video footage." (Pl. Br. 10).

- Defendant "never asked Plaintiff's girlfriend whether she had allowed Plaintiff to use her car – the Impala – on the night of Rolon's murder." (Pl. Br. 10).

- Defendant did not request trace evidence be performed on Brittingham's or Simmon's clothing. (Pl. Br. 11).

- Defendant did not request trace evidence be performed on additional evidence obtained from the vehicle. (Pl. Br. 13, 14).

- Defendant did not order a "one-to-one comparison [be performed] from the finger print lifts obtained from the Chevrolet Silverado and the fingerprint cards." (Pl. Br. 13).

These arguments that Defendant did not obtain further information that might have proven exculpatory, even if true, do not show the indictment was obtained by fraud, perjury, or other corrupt means. The only allegation Plaintiff makes which alludes to "fraud, perjury or other corrupt means" of obtaining the indictment is the argument that Defendant "appeared at [Ford's] house and pressured her to accompany them to the Prosecutor's Office," that Green "stated Ford owed it to Luis to tell the investigators who killed him and that she hesitated on

17

Plaintiff's picture," that "[u]nder duress and pressure, in tears crying, and desperate to return home and see her children, Ford replied 'if that's who you want it to be, then that's who did it,' and selected Plaintiff as the shooter," and that "Ford did not believe she was free to leave the Prosecutor's Office." However, Plaintiff fails to connect the allegedly coerced identification to Defendant.

It is undisputed that Defendant and Detective Campbell arrived at Ford's home on the morning of January 17, 2008 and that she identified Plaintiff from a photo array later that day. Ford stated that she felt "pressured" into identifying Plaintiff. However, it is also undisputed that Ford identified the individual who pressured her as an older white man with white hair and a moustache, who Ford identified as someone different from Defendant, who had interviewed her the night before. Ford and the older man were the only people in the room at the time Ford was feeling pressured. Even if this identification were obtained by fraud or corrupt means, such fraud or corruption is not tied to Defendant.

The Court further takes guidance from case law regarding a prosecutor's obligation to present exculpatory evidence to a grand jury. "The Third Circuit has held that a prosecutor's failure to present allegedly exculpatory evidence to the grand jury is not 'fraud, perjury or other corrupt means' sufficient

18

to rebut the presumptive effect of a grand jury indictment and defeat a motion for summary judgment in a malicious prosecution claim." Outen v. Office of the Bergen Cty. Prosecutor, No. 12-123, 2013 U.S. Dist. LEXIS 162701, at *18 (D.N.J. Nov. 14, 2013) (quoting Camiolo, 334 F.3d at 363); accord Milburn v. City of York, 612 F. App'x 119, 123 (3d Cir. 2015) ("[W]hile [Plaintiff] complains that the defendants failed to present evidence to the grand jury that tended to implicate other individuals, that is insufficient to rebut the presumption created by the presentment."); Camiolo, 334 F.3d at 363 ("[C]ourts have no authority to prescribe a rule which would require a prosecutor to present exculpatory evidence to a grand jury.").

The same logic follows that a purported failure to conduct further investigation that could have led to the discovery of exculpatory evidence does not constitute "fraud, perjury or other corrupt means."[5] The District of New Jersey has recognized this in analyzing a malicious prosecution claim under New Jersey

---

[5] To be clear, Defendant, while not obligated to do so, did provide exculpatory evidence to the grand jury, more specifically that Plaintiff denied involvement in the murder. Defendant further relayed Plaintiff's account of his whereabouts on the night of Rolon's murder. He informed the grand jury that he confirmed a bus was leaving the Walter Rand Transportation Center that night, that Whitfield told him that it was Plaintiff who had dropped him off, and what he had seen in the video footage. This candid description of Plaintiff's alibi further undermines any claim that the indictment was procured by "fraud, perjury or other corrupt means."

19

law, stating "[a] failure to investigate potentially relevant facts is irrelevant to the determination of whether the facts then in possession of investigators were a sufficient basis for probable cause." Shann v. Atl. Health Sys., No. 12-4822, 2017 U.S. Dist. LEXIS 186758, at *84 (D.N.J. Nov. 13, 2017) (assessing a malicious prosecution claim under New Jersey law) (first quoting Carollo v. Supermarkets Gen. Corp., 597 A.2d 1105 (N.J. Super. Ct. App. Div. 1991); and then quoting Stolinksi v. Pennypacker, 772 F. Supp. 2d 626, 638 (D.N.J. Feb. 16, 2011)). The Court concludes that summary judgment is appropriate.

Accordingly, the Court need not address the remaining elements of a malicious prosecution claim. More than adequate probable cause existed for Plaintiff's arrest. The Court will grant Defendant's Motion for Summary Judgment. An appropriate Order will be entered.

Date: August 24, 2018      s/ Noel L. Hillman
At Camden, New Jersey      NOEL L. HILLMAN, U.S.D.J.